Avon Privett v. Commissioner.
Privett v. Commissioner
Docket No. 33860.
United States Tax Court
1953 Tax Ct. Memo LEXIS 83; 12 T.C.M. (CCH) 1189; T.C.M. (RIA) 53242; October 26, 1953
*83 Held, taxpayer not being proven guilty of fraud, all deficiencies and additions to the tax determined by respondent are barred by the statute of limitations. Stanley Worth, Esq., Jules Korner, III, Esq., and R. L. Steele, C.P.A., for the petitioner. William R. Bagby, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and additions to the tax, as follows: Year
Deficiency
50% Penalty
1936
$ 5,929.67
$ 2,964.84
1937
1,631.17
822.61
1938
47.82
23.91
1940
2,591.95
1,295.98
1941
427.96
213.98
1942
22,252.40
11,126.20
1943
14,067.17
7,033.59
The questions in issue are: (1) whether the respondent was justified in using the net worth method in determining the deficiencies in question for the years 1936 to 1938, inclusive, and 1940 to 1943, inclusive, (2) whether the petitioner filed false and fraudulent income tax returns for any of these years with intent to evade tax, and (3) whether the deficiencies determined are barred by the statute of limitations. If no fraud is proved the statute of limitations bars all deficiencies. Findings of Fact
*84 The facts stipulated are found accordingly. Avon Privett, the petitioner, is an individual whose residence during the taxable years in question was Zebulon, North Carolina, where he was engaged in the business of operating an automobile agency, a garage and a service station. He was also engaged in farming and obtained some income from rental of properties. He first began farming in 1914 and in 1934 he purchased a farm of his own which he began operating in 1935. In 1936, he also operated a small farm given to his wife by the petitioner's father-in-law. In 1943, the petitioner had about 875 acres of farm land, approximately 375 acres of which were cultivated. The petitioner hired tenants and farm hands to do much of the actual cultivation of crops, although he spent considerable time at his farming operations. About 1922, the petitioner entered the filing station business in Zebulon as a partner. In 1925, the partnership having been dissolved, the petitioner moved to a new location on a highway in Zebulon and opened a service station under the name of Zebulon Motor Co. During 1929, the petitioner held a car dealership for one year and in 1933 he had a dealership for Dodge and *85 Plymouth cars. In 1934, petitioner, in partnership with one Carlton, acquired a Ford dealership which was conducted until 1935 when the partnership was dissolved and the petitioner became sole owner of the business. The petitioner moved this business to the service station and continued to use the name Zebulon Motor Co. in the business of selling new Ford cars. Petitioner ceased dealing in new cars in 1941 and did not commence this business again until 1946. During the time he sold new cars, petitioner dealt in used cars traded in on purchases of new ones. The Zebulon Motor Co. sold soft drinks, candy and beer, as well as the usual service station products. The petitioner also held an interest in an auto repair garage under the name of Philett Motor Co. The petitioner had completed high school at the age of 18 and had attended the University of North Carolina for a year and a half, where he took a business and commerce course. He left school in 1921 and began the operation of his service station in 1922. In 1931, the petitioner was married to Ernestine Whitely. Prior to his marriage, he had lived at home with his parents on a farm. After his marriage, the petitioner and his wife *86 moved to a three room apartment over his gasoline station in Zebulon. In 1936, they moved to a residence in Zebulon, which has since been their home. The petitioner had been a city commissioner for two years and was mayor of Zebulon for nine years. The petitioner had been raised on a farm operated by his parents. During the years here involved, the petitioner did not contribute to the support of his parents. The petitioner received $4,427.16 as his share of his father's estate after his father died in 1944. The petitioner was also a member of an advisory committee of the Peoples' Bank and Trust Company of Zebulon, which reviewed applications for loans by people who lived in the area. The petitioner rented a safe deposit box in the Peoples' Bank and Trust Company soon after the bank opened in September, 1935, and he maintained a box there throughout the period in question. This was the only safe deposit box that the petitioner or his wife ever rented. The petitioner did not file an income tax return for the years 1921 to 1935, inclusive. His first return was for the 1936 calendar year. Separate sets of books were kept for the Zebulon Motor Co. and Philett Motor Co. throughout the *87 period here involved. During the years 1937, 1938, and 1939, these books were kept by a bookkeeper named Page. Separate journals were kept for the two enterprises and postings were made to separate ledger accounts. Page kept a daily cash record of sales and expenditures. From the ledger he took into the books income from the service station, used cars, new cars, and the expenses incurred in these businesses. Cash records were taken from a cash register tape. At the end of each working day, receipts and disbursements were totaled and checked against cash and entered on a cash receipts and disbursements sheet. The cash register tapes were kept on a clip on the wall. At the end of each month, the tapes were tied together and put in a filing cabinet in a safe kept in the Zebulon Motor Co. office. At the end of each year, the tapes were put in a box and labeled and put in a storage room. The petitioner's wife kept the books during the years 1941, 1942 and 1943. The petitioner did not keep the books but instructed Page and his wife during the time they served as bookkeepers to maintain the existing bookkeeping system. Balance sheets and profit and loss statements were not prepared from the *88 books. A receipt book was also kept at the Zebulon Motor Co. for rental payments received by the petitioner. The petitioner's income tax returns were prepared by certified public accountants in Raleigh, North Carolina, from the books and information furnished by the petitioner. The petitioner himself kept the books and records relating to farms. The petitioner's wife maintained the bookkeeping system for rental properties. The farm records recorded items of receipts and expenditures made by the petitioner in connection with his farms. Advancements to tenant farmers for seed, fertilizer, repairs, and equipment, as well as personal living expenses where needed, were recorded. At the end of the season for cash crops, such as cotton and tobacco, the proceeds from the sale of the crop were divided equally between the petitioner and the tenants, after charges against tenants' shares for personal and farm expense advancements. The petitioner retained his old books and records and canceled checks at the Zebulon Motor Co. Current records were kept in loose leaf binders in a safe in the Zebulon Motor Co. office. During the years 1930 to 1933, the petitioner was in the poultry business in Zebulon *89 but it did not prove profitable. The petitioner was not engaged in farming during the years 1922 to 1932, inclusive. In 1933, he returned to farming operations after his father-in-law had given his wife a six acre farm in 1932. In 1934, petitioner purchased another farm and during the years 1936 through 1943, the petitioner was engaged in expanding his farming operations with emphasis upon the production of cotton and tobacco. In 1936, petitioner raised 18 acres of tobacco and in 1943, he had over 50 acres of tobacco in cultivation. The net farm income reported by petitioner for the years 1936 to 1943, inclusive, is as follows: Year
Net Farm Income
1936
$ 1,587.22
1937
1,680.29
1938
( 270.35)
1939
( 728.17)
1940
(2,136.85)
1941
1,223.11
1942
3,394.85
1943
1,032.11 Petitioner had a personal checking account at the Peoples' Bank and Trust Company but no special bank accounts were employed for his farm and real estate operations. Farm receipts and rentals were deposited in his personal account and checks for disbursements relating to these properties were issued on this personal account. Petitioner personally made the deposits to this account. Real estate *90 purchases made during the period were principally paid for by check issued after the petitioner deposited sufficient cash to cover the check. No separate set of books and records were maintained with respect to real estate holdings. The rental income reported by the petitioner, as well as the cost and basis for depreciation claimed on rental property and the total number of rental properties and business properties rented, for the years 1936 to 1943, inclusive, are as follows: Total
Cost and
Business
Number
Basis of
Rental
Properties
of Rental
Depreciation
Income Reported
Reported
Properties
for Rented Prop-
Year
Net
Gross
Rented
Reported
erties Reported
1936
$ 443.40
$ 715.00
0
4
$ 6,400
1937
323.65
1,570.00
2
9
22,000
1938
3,517.11
5,100.42
2
11
25,500
1939
2,539.87
4,319.77
4
13
30,100
1940
2,083.68
4,166.59
4
12
30,100
1941
1,653.12
3,894.50
4
14
31,100
1942
1,348.75
3,583.32
4
14
31,100
1943
( 53.10)
3,183.55
4
14
31,100
The nature of petitioner's farming activities required him to transact a substantial part of his business in cash. The petitioner's tenants, *91 many of whom were iliterate, did not maintain bank accounts and in his advances to these tenants the petitioner either gave cash or wrote a check which the tenant could cash at the Zebulon Motor Co. When crops were sold, checks were issued jointly to the petitioner and the tenant. Petitioner had also maintained sizable amounts of cash because of the bank situation during the 1930s. In December 1930, the bank, then serving Zebulon, was closed but the petitioner had withdrawn his money prior to the closing upon the warning of his father-in-law, who was a director of the bank. From 1930 to 1935, there was no bank in Zebulon. When the petitioner and his wife moved into the three room apartment above the filing station in 1931, petitioner kept cash in a safe in the apartment. Several other families lived above the filling station and the service station was kept open 24 hours a day. On September 2, 1935, the Peoples' Bank and Trust Company of Rocky Mount, North Carolina, opened a branch office in Zebulon and the petitioner then established accounts, both personal and business, with this bank. It was at this time that the petitioner rented the safe deposit box. In September, 1935, the petitioner *92 deposited $27,000 in the safe deposit box, which was counted by the cashier at the bank. In April, 1936, petitioner moved from the apartment and did not take the safe with him. On May 31, 1939, the petitioner executed a statement of assets and liabilities with the Peoples' Bank and Trust Company, as follows: ASSETS
Cash - On Hand and in Bank
$ 19,922.14
Accounts Receivable - Good
2,200.00
Bills Receivable - Good
7,500.00
Farm Products on Hand - Cotton
5,000.00
Merchandise on Hand for Sale
Equipment
Filling Station
5,000.00
Total Current Assets
$ 39,622.14
Live Stock on Hand
3,900.00
Farm Land (1,158 acres)
57,900.00
Town or City Real Estate
42,450.00
Farm Implements and Machinery
2,600.00
Investments in Stocks and Bonds
(at present market)
1,000.00
Any other Property or Investments
Autos 1
1,500.00
TOTAL
$148,972.14
LIABILITIES
Bills Payable: To Banks for Money Borrowed
$ 1,200.00
Total Current Liabilities
$ 1,200.00
Mortgage Indebtedness - Farm
Property
10,740.00
Total Liabilities
$ 11,940.00
Net Worth
137,032.14
TOTAL
$148,972.14 At the time he filed this statement, the petitioner had the following balances in his bank *93 account: 1. The Bank of Wendel Avon Privett
$10,201.00
2. Peoples' Bank and Trust Company
Avon Privett
870.01
3. Peoples' Bank and Trust Company
Zebulon Motor Company
922.14
Total Bank Balances
$11,993.15
Cash on hand and in bank per finan-
cial statement
$19,922.14
Admitted bank balances
11,993.15
Balance
$ 7,928.99
The petitioner's tax returns for the years 1936 through 1948 were examined by the respondent's agents beginning in 1949. In the course of the examination, the agents obtained the petitioner's books, records, bank statements, checks, and farm records for the years 1943 through 1948 with some exceptions. The petitioner was interviewed by respondent's agents, answered their questions and made available the books and records for the years in question. The petitioner's safe deposit box was also examined. In June, 1949, the safe deposit box held bonds costing $35,000 but no cash. The agents took some of the petitioner's books and records and give the petitioner a receipt for those taken. No books or records relating to the petitioner's real estate activities were discovered. The respondent's agents attempted to determine the petitioner's correct *94 net income by use of the books and records made and by means of a profit and loss determination verified by third persons. The agents determined that the books and records were not adequate to properly determine the petitioner's income. For the years 1944 through 1948, the respondent determined no deficiencies. For the years 1936 through 1943, the respondent reconstructed the petitioner's income by use of the net worth method. The books and records maintained for the years 1944 to 1948 were of the same type as those of the earlier years but the respondent determined that the records for the earlier years were incomplete. In determining the petitioner's assets and liabilities for the years in question, the respondent allowed petitioner nothing for "cash on hand" prior to the year 1939. The respondent's agents determined that further inquiry was necessary with respect to the petitioner's real estate holdings and transactions. The agents examined the records of the counties named by the petitioner as ones in which he owned property. In August, 1949, the petitioner furnished the respondent's agents with a list of real estate properties. The list included a statement of mortgages, life *95 insurance policies in force and realty owned. The statement was submitted by the petitioner after consultation with his attorney and accountant. The respondent's agents then checked this statement with court records and verifications from third parties. The respondent determined the petitioner's cash on hand for the years 1943 and 1944 by means of the intangible property returns filed by petitioner with the State of North Carolina Revenue Department, as well as petitioner's books and records. On December 31, 1935, the petitioner owned real estate costing $29,391.34. During the years 1936 to 1943, he made improvements totaling $30,465.69. He also purchased real estate at a total cost of $16,973.80. His total cost of real estate on December 31, 1943 was $76,830.83. In November, 1934, the petitioner purchased a lot with a building on it for $325 and in 1936 made improvements costing $1,000. The petitioner and his wife moved into this residence in 1936. In January, 1939, the petitioner purchased a new automobile at a cost of $925, plus an allowance for the value of a 1937 Ford sedan. In March, 1935, petitioner, through his wife, loaned his father-in-law, J. M. Whitely, $5,000 which was *96 repaid during 1936. The mortgage deed securing this loan covered two real estate properties called the Cafe Building and Whitley Building and these properties appeared on the petitioner's list of real estate submitted to the examining agent as conveyed to the petitioner by Whitley on December 28, 1936. The petitioner's wife had no sizeable gifts or inheritances except for the gift by her father of a six acre farm two years after her marriage. The real estate list submitted by the petitioner to the respondent's agent reveals gifts of two small parcels of land in 1932 from Carrie Yarborough and J. M. Whitley, respectively. The petitioner had no gifts or inheritances during the years 1936 through 1942. In 1930, he purchased a diamond ring for $325, which he still owned on December 31, 1943. In his intangible personal property tax return for the year ended December 31, 1943, the petitioner reported: Money on Hand $1,119.89; Total Accounts Receivable $1,828.21; and Accounts Payable $580.34. In his 1936 income tax return, petitioner claimed an interest deduction for two principal payments of $112.12 and $120 on his obligation with the Federal Land Bank. During the years 1936 through 1941, *97 the petitioner sold several tracts of land, which sales were not revealed on any of his income tax returns. As a result of the petitioner's failure to report all sales of real estate properties, no capital gains were included in his taxable income. The petitioner expended $116.25 during each of the years in question as a premium payment on a $5,000 life insurance policy. He also spent $70.25 during each of the years involved as a premium payment on a $2,500 life insurance policy taken out in February 1936. During 1941, the petitioner made a contribution of $1,000 to a church. The respondent determined the petitioner's cash on hand, total assets, total liabilities, living expenses, and net worth, as follows: Year
Cash on
Total
Total
Living
Net
Ended
Hand
Assets
Liabilities
Expenses
Worth
12/31/35
$ 0
$ 61,668.02
$18,393.02
$ 0
$ 43,275.00
12/31/36
0
84,122.98
13,754.02
3,800
70,368.96
12/31/37
0
107,367.35
14,806.97
4,200
92,560.38
12/31/38
0
109,858.71
18,101.72
4,800
91,756.99
12/31/39
6,257.16
119,974.14
30,039.77
4,800
89,934.37
12/31/40
5,937.29
129,500.64
23,301.51
4,800
106,199.13
12/31/41
7,050.86
131,099.27
26,381.07
4,800
104,718.20
12/31/42
6,463.38
175,431.49
28,953.98
4,800
146,477.51
12/31/43
6,610.17
203,491.52
30,462.60
4,800
173,028.92
*98 The respondent, by use of the net worth method, determined the petitioner's unreported net income as follows: Reported
Unreported
Correct
Year
Net Income
Net Income
Net Income
1936
$3,496.82
$27,397.14
$30,893.96
1937
2,503.56
23,590.65
26,094.21
1938
1,771.51
2,219.10
3,996.61
1940
( 966.40)
22,067.77
21,071.77
1941
1,705.54
373.24
2,078.78
1942
4,914.15
41,658.89
46,573.04
1943
4,337.90
27,735.26
32,073.16
The petitioner opened a savings account with the Peoples' Bank and Trust Company on December 5, 1935. The balance of that account at the close of that year was $12,000. The account was maintained until some time in 1942. The respondent's original net worth determination omitted this account from the petitioner's opening net worth but upon revising the net worth statement this account was included. The respondent also omitted from cash on hand as of December 31, 1935, $27,000 kept in petitioner's safe deposit box. The respondent's net worth determination omits a bank certificate of deposit owned by the petitioner at the close of 1941 in the amount of $2,000. The net worth statement also omitted a bank account in the name *99 of Philett Motor Co. with the Peoples' Bank and Trust Company which existed at the beginning of the taxable period. Also omitted from the petitioner's opening net worth are Town of Zebulon certificates and bonds in the amount of $4,000. Similarly omitted from the opening net worth is an investment of $500 in stock of the Zebulon Building and Loan Association. Respondent also omitted accounts receivable for the years prior to December 31, 1938, as well as notes receivable to December 31, 1939. The amounts determined by the respondent as living expenses were the results of estimates by respondent's agents. The petitioner filed income tax returns for each of the years in question with the collector of internal revenue for the district of North Carolina on the following dates: Tax Year
Date of Return
1936
Apr. 3, 1937
1937
Mar. 15, 1938
1938
Jan. 13, 1939
1940
Mar. 18, 1941
1941
Jan. 12, 1942
1942
Jan. 19, 1943
1943
June 9, 1944 The respondent's notice of deficiency was mailed to the petitioner on January 26, 1951. No part of the deficiencies determined for the years 1936 to 1938, inclusive, and for the years 1940 to 1943, inclusive, was due to fraud *100 with intent to evade tax. Opinion VAN FOSSAN, Judge: All of the deficiencies here involved are barred by the statute of limitations unless taxpayer is proven guilty of fraud. The burden of proof rests on the respondent. On the whole record we have found as an ultimate finding of fact that taxpayer was not guilty of fraud. This finding, which is supported by an overwhelming weight of the evidence, is dispositive of the entire case. Decision will be entered for the petitioner.